* M’Kean C. J.
The answer to the first question *2631 J depends on the construction of a resolve of the general assembly, passed on the 5th December 1778, “that all mat-1 ‘ ters as may appear to the council to be absolutely necessary “to the comfort of the troops of this state, be sold to them “for one-fourth part of the original cost for cash only,” &c. and of another resolve of 13th March 1779, “that to every ‘ ‘ officer of the said troops, a complete suit of regimental uni“form be furnished every year by this.state, to be charged to ‘ ‘ the officer at the price for which the said uniform might “have been purchased at the commencement of the war, &c.” and of an act of assembly, passed 1st March 1780, whereby a complete set of uniform was directed to be given annually to each officer gratis, during the war.
Respecting this, there seems to have been a legislative con *263 struction; for it appears in the journals of the assembly of the 14th and 18th December 1780, that the legislature would not charge the officers with clothes, &c. furnished them, with the specie price; from which it may be clearly inferred, the clothes that had been furnished them, were to be paid for in continental bills of credit only, and under the second resolve before cited, the price was to be regulated by the price at the commencement of the war.
Without the aid of this authority, I should have been of opinion, that the clothes thus furnished the officers were to be paid for in continental bills of credit, and that this was the intention of the then assembly. Because first, whatever might have been their private sentiments respecting these bills being depreciated, they deemed it inexpedient to acknowledge it in their public character. 2dly, Because continental money was then by law equal to specie, and it was penal to make a distinction between them. And lastly, because it is manifest they intended to be generous to, or at least to relieve the known distresses of the officers of the state, both in the army and navy. For by the first resolve, the assembly directed, that the officers should be furnished with the articles necessary for them, at a fourth part of the then original cost, for cash only; and by the second, they were to be furnished with a complete suit of regimental uniform, at the price for which it might have been purchased at the commencement of the war, intending thereby a further gratification, which at first view may appear paradoxical. After-wards, by an act of assembly, a complete suit of uniform, (the particulars of which are specified in the 8th section,) was allowed to be given annually to each officer gratis, during the war. Ret it.be assumed for illustration, that a complete suit of uniform, at the original cost, on the 5th December 1778, would amount to 240I. * continental money, the officer r*o«4 for this was to pay a fourth part, or 60I. The depreci- L ation of the continental money having been since fixed by law to have been on that day 6 for 1, the specie price to be paid by the officers would be iol. On the 13th March 1779, the same specie price at the commencement of the war being allowed for a complete suit of uniform, viz. 40I. the officer was to pay that sum in continental money, which according to the same scale fixed by law, would amount only to 3I. 6s. 8d. the depreciation then being 12 for 1. As to this point, therefore, I think if the plaintiff is to be debited at all, it can be only for this last sum, or in that proportion.
With respect to the second question, it appears to me to be involved in obscurity and doubt; but in such a case, I shall conceive it less injurious to err, (if I do err,) in favour of the individual than of the commonwealth, because the error against the individual may be very distressing, whereas if against the commonwealth, it will hardly be felt, and I know I must contribute my proportion of the money awarded.
*264 It seems to be unnecessary to cite tbe several resolves of congress allowing half pay to tbe officers of the army of the United States, or of the assembly of Pennsylvania on the same subject respecting the troops of the state, as the principal ground on which our present decision must stand, is the act of assembly, entitled, “An act for the more effectual sup- “ ply and honourable reward of the Pennsylvania troops in “the service of the United States of America,” passed the ist March 1780. By the 15th section thereof, it is enacted, that “ the officers of the navy of this state, who were in ser“vice on the 13th March 1779, and shall continue therein “until the end of the present war, or until honourably discharged, shall be entitled to the allowances and benefits ‘ ‘ hereinbefore granted to the military officers, &c. respectively of the Pennsylvania troops, as to half pay and clothing, and to the like supply and distribution of the articles “above enumerated, subject to the same limitation and conditions; the half pay of the navy officers to commence at “ the expiration of the present war, or their discharge.” On the 35th of March 1784, the assembly resolved, “that as one ‘1 of the designs in granting half pay to the said navy officers, “was to place them on a footing with the officers of the “army, that the officers of the navy of this state, entitled to “half pay for life, under the resolutions of the 34th March “1779, and confirmed by act of assembly, passed the ist “March 1780, be allowed five years full pay in lieu thereof, to ‘ ‘ be paid at the same time, and in the same manner, that the ‘ ‘ officers of the army in the line of this state are or shall be *00*1. “paid, and that their accounts be liquidated and -I “settled by the comptroller general, and certificates “given them.”
Erom the foregoing it appears, that a distinction has been made as to the time when the half pay should commence, . between the officers of the army in the line of this state, and those of the state navy. The half pay of the former is confined to such of them as should continue in the service of the United States during the war, and was to commence at the conclusion of the war; but that of the latter, was to commence at the time of their discharge from service. The plaintiff was honourably discharged from service on the 13th February 1781, and was incontestibly entitled to half pay from that time until the 35th March 1784, when he commuted his half pay for life for five years full pay. The sole question then is, whether this act of commutation has barred the recovery of the half pay then due to him, viz. for three years one month and twelve days, as well as his future half pay.
It has been contended for the commonwealth that his accepting a certificate for five years full pay is a bar to the arrearages; for that by a resolve of congress of the 33d March 1783, adopted by the assembly on the 33d September 1783, *265 it is directed that “with respect to retiring officers entitled to “half pay for life, the commutation if accepted by them, “shall be in lieu of whatever may be now due to them since “the time of their retiring from service.” On this, the whole difficulty respecting the plaintiff’s claim, rests.
In answer to this, it has been asserted (and acceded to) that the plaintiff at the time he received his certificate from the comptroller general, as well as the other navy officers, gave him notice, that they meant not thereby to relinquish the arrears of half pay then due to them respectively; and it was further contended, that the last mentioned resolve did not relate to the officers of the state navy of Pennsylvania, but to the officers of the army in the service of the United States only.
It appears to me, that the clause in the resolve of the 22d of September 1783, relates only to retiring officers of the army, and that the navy of the state of Pennsylvania was not at all then in the contemplation of the congress, or assembly. Besides none of the officers of the state navy had retired; the plaintiff and four or five others had been honourably discharged from the service, by the Supreme Executive Council of Pennsylvania. Who the retiring officers of the army were, I do not well know; perhaps those who became supernumerary, or reduced in consequence of the resolves of congress of the 21st of October 1780, *or such as had retired with p2gg the consent of the commander in chief, after notice of L the provisionary articles of peace of the 30th November 1782. And it is at least doubtful, whether the half pay of these officers was to commence before the conclusion of the war; for those who continued to undergo the fatigues and hardships of a camp, and to endanger their lives in battle until the termination of the war, seemed to have a greater claim on their country than those who retired from the service; and of this opinion was the congress, as appears in their resolve in general Maxwell’s case on the 8th August 1780. The words in the resolve regarding reduced officers of the 21st October 1780 are, “ that they are to be allowed half pay for life;” but no mention is made of the time when it was to begin, nor did the congress make any provision for the payment of it prior to the conclusion of the war. Be this as it may, it is certain, that no officers of the army in the line of this state were entitled to half pay by any act or resolve of the assembly, excepting such as should serve till the end of the war, and that those in their navy were entitled to it from the time of their discharge. The navy officers could not be placed on a footing with the officers of the army of the state, if the latter got five years full pay in lieu of what was to become due to them for half pay from the end of the war, and the former got only five years full pay in lieu of what was to become due to them, but also of several years arrears then past, for the payment of which they had a legislative security. Besides, the officers *266 of the'army had large bounties in lands, not only from the state but also from the United States; but the officers of the state navy had none. Could this have been the intention oí the legislature ? I should think not, because of the great inequality it would create, not only between their officers in the laud service and sea service, contrary to their express declaration, but also between the latter themselves; for by accepting the commutation, the one would lose more than another in proportion to the times they were respectively discharged. This would be so unreasonable and unjust, that unless they had expressly and manifestly thus declared, I am inclined to entertain a contrary sentiment. Their design rather appears to have been to place their navy officers on a footing with the most favoured of their land officers; because they expressly allowed them half pay from the time of their discharge, but to the others, only from the end of the war. It is a pity this affair has been left so embarrassed; but the best conclusion I can form upon the whole, is in favour of the plaintiff on this question also.
*Shippen, J.
I am clearly of opinion with the plaintiff on the first point.
-*
As to the second point, by the resolution of assembly of the 24th March 1779, confirmed by the act of assembly of the 1st March 1780, the officers, seamen and marines employed in the service of the state, and who were in actual service on the 13th of March last, and should continue therein until the end of the war or till honourably discharged, were entitled to the same allowances as to half pay, cloathing &c. as had before been granted to the land officers and soldiers; with this difference only, that the officers of the land army who were allowed by congress half pay for seven years after the end of the war, were allowed by the assembly half pay from the end of those seven years during their lives; whereas the officers of the navy were allowed half pay from the end of the war, or their discharge.
The navy officers were discharged on the 13th February 1781, before the termination of the war; of course they were entitled to half pay from that time.
On the 25th March 1784, the resolution passed, which substituted the five years full pay to the officers of the navy, in lieu of their half pay during life. It takes notice that one of the designs of granting half pay to the navy officers, was to place them on a footing with the officers of the army. With this view they resolve, “that the officers of the navy of this ‘ ‘ state, entitled to half pay for life under the former resolu- ‘ ‘ tion and law, should be allowed five years full pay in lieu “thereof, to be paid at the same time and in the same manner “that the officers of the army in the line of this state are or “shall be paid.”
As it was the apparent intention of the assembly to put the *267 officers of the navy upon the same footing as to their half pay and commutation with the officers of the army, it is material to consider what that footing was.
By the resolution of congress of the 21st October 1780, the retiring or reduced officers of the army were allowed half pay, without expressly ascertaining the time of its commencement, whether from the time of their reduction or-from the end of the war. Whether the words in the next clause, “from the ‘ ‘ time of their reduction ’ ’ relate to the preceding clause, or are confined to the latter, may possibly be somewhat doubtful. But as there is no future time mentioned for its commencement, the very nature of the allowance, as well as common humanity to meritorious servants of the public, and the practice of other countries in such situations, all concur to shew the meaning of congress must have been, that the half pay was to begin when the full pay ceased.
*By the commutation resolution of congress of the r*ofi« 22d March 1783, their construction of the above reso- *- lution appears plainly to be, that the half pay was due from the time of their reduction; because they make an express provision, that those officers, who had retired at different periods of the war, entitled to half pay during life, should accept the commutation within six months in full of arrears as well as their future half pay. There seems to be no subject for this provision to operate upon, unless the retiring officers had been entitled to half pay from the time of their reduction; indeed, the words are too plain to admit of a doubt. They are these: “Shall be in lieu of whatever may “be now due to them since the time of their retiring from “service, as well as of what may hereafter become due.”
If then the assembly meant to put the navy officers upon the same footing with the officers of the army, and if the officers of the army were entitled to arrears and were to give up 'their, claim to them, it should seem, that this being within the knowledge of the assembly, and no arrears having been paid to the officers of the navy, any more than to the officers of the army, they must mean that the five years full pay should be a compensation for arrears as well as future pay, with regard to both equally; otherwise, instead of being silent on the subject, they would naturally have said, it should be exclusive of their arrears, instead of which they say, it shall be paid in lieu thereof, that is, in lieu of “ their being “entitled to half pay for life under the resolution of 24th “March 1779, confirmed by act of assembly of 1st March “1780,” which seems to include all they were entitled to. To continue the similarity between the two kinds of officers, they say, the allowance by way of commutation, “shall be ‘ ‘ paid to the officers of the navy, at the same time and in the “same manner, that the officers of the army in the line of “this state are or shall be paid, and that their accounts be *268 ‘ ‘ liquidated and settled by the comptroller general, and certi“ficates given them.”
It seems their accounts were thus liquidated and settled by the comptroller general, and certificates given them accordingly. For these reasons I am of opinion, although against my wishes, that the navy officers having accepted the commutation, are not entitled to the previous arrears of half pay.
Yeates J.
There is little difficulty on the first question. It appears by the journals of the assembly of 13th March 1779, that, “in consideration of the services rendered by the ‘ ‘ state troops, and to relieve as much as possible the incon“veniences to which they are at present subjected,” the as-*2691 semhly amongst * other things resolved, that “every J “officer of the said troops should be furnished with a “complete suit of regimental uniform, to be charged to the ‘ ‘ officer, at the price for which the said uniform might have “been purchased at the commencement of the war.” They also resolved, that certain specific articles should be furnished to the officers and soldiers, at certain determinate rates, as muscovado sugar and coffee at 3s. 9d. per lb., &c. They further resolved on the 24th March following, that ‘ ‘ these allowances and benefits” should be extended to the officers, seamen, and marines, employed in the naval service of this state. These supplies were therefore intended as advantageous and beneficial to the army and navy, and succeeded the articles voted in the preceding sessions, at prices in a certain ratio or proportion to the original cost.
If the officers paid for the cloathing or articles supplied them in 1779, it would have been in the continental currency which they received for their pay; and if they did not pay for them, it remained as a charge to be ascertained by the rate of depreciation at the time they were delivered, according to the price of such articles or cloathing at the commencement of the war. It would be strange indeed, that one set of officers should discharge their debts to the' public in a paper currency highly depreciated, and another set should be called on to pay the same sums in specie.
This point is still made more clear by the clause which certain members of the house wished to have inserted in the act of 18th December 1780, on the 14th of the same-month, and which on the 18th produced a dissent of eleven members. They insisted, that the auditors who should settle the depreciation of pay of the officers and privates, should give credit to the state for so much of the said depreciation, as had been made up by the state stores of rum, sugar, tea, and tobacco, issued to the said troops, and of all cloathing furnished to the commissioned officers at specie price; but the clause was rejected in the house by a majority of 44 to 12 members.
The .second question is attended with much greater difficulty; and in my idea, it becomes expedient for the solution *269 of it, to examine the several ‘ ‘ public acts ’ ’ on which it depends. They all stand connected with each other.
On the 15th May 1778, congress unanimously resolved, that all military officers commissioned by them, who continued in service during the war, should, after the conclusion of the war, receive half pay for seven years, if they lived so long.
The assembly of this state went further as to the Pennsylvania line, and by their resolve aforesaid of 13th March 1779, determined that their officers should be entitled to the ^*070 continuance of half pay from the end of the said seven L years, for and during the life of every such officer. And on the 24th March following, they likewise resolved, that the half pay of the state naval officers, who continued in service during the war, should commence on the termination of the said war, and be continued during their respective lives.
These provisions were further confirmed by a law of the state, enacted on the 1st March 1780; and the 15th section thereof included the case of the state navy officers, who were declared entitled to half pay during life, at the expiration of the war, or their honourable discharge.
On the 21st of October 1780, congress made a new arrangement of the army, and resolved, that the officers who should continue in the service till the end of the war, should be entitled to half pay during life; and, that the names of those officers who should be reduced by the new organization of the army, should be transmitted to congress, who were to be allowed half pay for life.
On the 22d March 1783, congress, in pursuance of a memorial transmitted by a committee of the officers of the several lines, soliciting a commutation of their half pay for an equivalent for a limited term of years, or by a sum in gross, resolved, that such officers who continued in service to the end of the war, should be entitled to receive five years full pay instead of their half pay for life, at the option of the officers of the lines of the respective states, expressed within certain limited periods; and that, such officers as had retired at different periods entitled to half pay for life, might collectively, in each state, accept or refuse the same within six months, but that the commutation, with respect to such retiring officers, if accepted by them, should be in lieu of whatever might be then due,or thereafter might become due to them.
There is some obscurity in the penning of the resolve of congress on the 21st October 1780, as it appears on the printed journals. As to the time from whence the half pay of the reduced officers shall begin, it has been doub'ed whether it shall commence from the period of their reduction, or from the end of the war. Taking the whole of the resolution together, I am of opinion that the period of such officers reduction, is the time of the commencement of their half pay for life. There is nothing in the resolve which directs its *270 commencement from the termination of the war; and, without doing violence to the words, the latter part of the succeeding sentence, “to commence from the time of their reduction,” may be well applied to the clause * preceding. To allow the reduced officers half pay for life, and to construe its beginning from the uncertain termination of the war, would, in my apprehension, be doing manifest injustice to congress, and violence to their expressions; and would, in the language of Judge Burnett on another occasion, (i Atky. 344,) “reduce them to starve in the desert, with the “land of Canaan in their view.” The words of the resolution of the 22d March 1783, considerably strengthen this idea, and amount to a congressional construction of their former resolve, evincing their clear and decided opinion, as to the half pay of such retiring officers commencing from the period of their reduction.
On the 9th September 1783, President Dickinson transmitted a memorial from the officers late of the state navy, to the house of assembly. It is a matter of regret, that the memorial cannot be found at this period. It would throw great light on the present question, as it must unquestionably convey the wishes and desires of the applicants.
The “public acts” to which the memorialists refer, are, in all probability, those which I have already enumerated. I cannot bring myself to believe, that they asked for more than was allotted by congress to the option of retiring officers of the army. Their cases were similar. Both classes had been promised half pay during life, and were meritorious citizens. The systems adopted by congress and the state, rendered their further immediate services unnecessary, and each were hon-ourably discharged. It remained with both sets of officers to say, in bodies, whether they would accept of the commutation, or rely on the faith of government for their half pay during life. If it be said, that the navy officers lives were worth, in point of calculation, a greater number of years than those officers who had continued in service until the end of the war, they being then actually entitled to half pay from 13th February 1781, when they were honourably discharged by the Supreme Executive Council, still the same remark holds in the case of the retiring officers, who were deranged under the resolve of congress of the 21st October 1780.
It appears by the resolutions of the assembly, that the house, on the 22d September 1783, adopted the ordinance of congress of the 22d March preceding, in totidem verbis, and, on the 25th March 1784, resolved, that the officers belonging to the naval department of the state, who were discharged in 1779, should be entitled to depreciation on their pay to the time of their discharge; and that the other navy officers who were retained in the service of the state during the war, or until honourably discharged, and were entitled to half pay dur *271 ing life, should be al*lowed “five years full pay in [-*072 “ lieu thereof, to be paid at the same time, and in the *- “same mannei-, that the officers of the army, in the line of ‘ ‘ this state, are or should be paid. ’ ’
The preambles to these resolutions state, that the “principle of equal justice” was the-ground thereof, and that “one “of the designs in granting half pay to the said navy offi- ‘ ‘ cers, was to place them on a footing with the officers of the “army.,”
I apprehend, therefore, that the intention of the legislature, and the true construction of the resolve of the 25th March 1784, was to put the state navy officers, who were honourably discharged by council, on the 13th February 1781, precisely on the same ground with the retiring officers of the army, in 1780, under the resolve of congress of .the 22d March 1783, as to the commutation for half pay; and that it must necessarily be intended, that the five years full pay were given as a full equivalent for the whole of their half pay; and, consequently, that the plaintiff in the present suit, is not entitled to his arrears of half pay from the 13th February 1781, until the 1st July 1783, as he now demands.'
Bradford, J.
Upon the first point, reserved for the opinion of the court, I concur with my brethren. The second turns upon the meaning of the words “half pay,” as used in the resolution of the 25th March 1784. Does it include the sums which were then due to the officers of the navy, or must it be confined to such as were to become due? that is the question. In common and familiar acceptation, the expression seems to be sufficient to include both. No provision had, at that time, been made for the .payment of any part of the half pay to which they were entitled under the act of 1780, and the arrears would naturally be blended with the right itself, under the general description.
But if the expression be doubtful, the intention must be collected from the reason assigned for making this offer to the claimants. It was ‘ ‘ to put them on a footing with the officers of the army.”
The officers of the army, those who retired in 1780, as well as those who continued in service until the end of the war, had accepted the commutation in lieu of all they were entitled to, under the grant of half pay for life. The resolution of congress upon this subject had just been adopted by the assembly, and it is reasonable to suppose that the navy officers neither asked for, nor expected more.
But it is said, that the half pay of those retiring officers was not to commence until the end of the war, and that therefore there is a distinction between their case and that of the navy * officers. Though I have had doubts on this 7*273 point, yet on comparing the different resolutions of *- and what has been *273 two of my brethren, I am satisfied that those officers were entitled to half pay from the time of their reduction. The clause in the commutation act is declarative of this, and that alone would have been conclusive in their favour, if they had refused to accept the commutation, and had insisted upon their half pay.
With this class of officers, the claimants were on a footing; both had rendered meritorious services; both had been hon-ourably discharged; both were entitled to half pay; and the assembly were willing to put them on a footing in this new mode of compensation. If they did not mean that this commutation should be in full of all the navy officers were entitled to, under the act of 1780, their silence about the arrears at that time, as well as from that time to this, cannot be accounted for.
I am confirmed in this construction, by considering the grant of commutation to the hospital surgeons. By an act passed in 1781, these officers were entitled to half pay from the end of the war. In December 1784, they applied for commutation, and state that ‘ ‘ this had become a general “mode of discharging the claim to half pay, and that the “last assembly had commuted the half pay promised to the “officers of the navy, for five years full pay.” It seems to have been the general understanding, that all claims to half pay were extinguished by the commutation, and in accepting it, some of these surgeons gave up fifteen months arrears, and others gave up more. The resolution of the assembly in their favour is copied from that under consideration, and is nearly in the same words. If the navy officers are entitled to arrears, so will the surgeons be, which has never been pretended.
I am therefore of opinion, that the navy officers are not entitled to the arrears they claim; but as they1 were to be on a footing with the retiring officers, their certificates ought to have borne date on the same day, viz. the 2 2d March 1783, and not on the 1st July. A sum therefore equal to the interest on their respective certificates for that period, must be carried to their credit in making up the account.
The whole court assented to this additional sum being debited by the plaintiff against the commonwealth, and judgment was entered accordingly for the plaintiff.